**Kenneth L. FISHER, Robert Wofford and Fred L. Fisher, Appellees,**

**v.**

**FLEMING-BABCOCK, INC., Appellant.**

**No. 83–1698.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1983.

Decided Oct. 5, 1984.

Donald J. Quinn, Donald J. Quinn II, Kansas City, Mo., for appellees Kenneth L. Fisher, et al.

Tom B. Kretsinger, Tom B. Kretsinger, Jr., Kretsinger & Kretsinger, P.C., Liberty, Mo., for appellant.

---

1. Because we reverse on this basis, we need not address the remaining allegations of error asserted by James.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Fleming-Babcock, Inc., an interstate motor common carrier, appeals from a final judgment entered in the District Court for the Western District of Missouri in favor of appellees, independent truck owner-operators, in an action brought by appellees to recover damages for appellant's failure to comply with fuel surcharge orders of the Interstate Commerce Commission (ICC) and the State Corporation Commission of the State of Kansas (KCC). For reversal appellant argues that (1) the district court lacked subject matter jurisdiction under 28 U.S.C. § 1336(a) (1976), (2) the ICC exceeded its statutory authority in enacting the fuel surcharge order, and (3) the ICC and KCC orders did not apply to shipments of exempt commodities or within exempt territories. For the reasons discussed below, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

Appellant is a motor common carrier certified by the ICC to operate in interstate commerce and by the KCC to operate within the state of Kansas. In July 1979 appellant entered into lease agreements with appellee Robert Wofford, an individual truck owner-operator, and Kenfre Trucking Co., a partnership truck fleet owned and operated by appellees Kenneth L. Fisher and Fred L. Fisher, whereby appellant leased appellees' equipment and hired appellees as drivers of said equipment in return for 88% of the gross revenue from truckloads transported by appellees. Appellees were responsible to pay all fuel costs of these hauls. Such lease arrangements are common in the motor carrier industry.[1]

*The fuel surcharge regulations*

In late spring 1979, in response to rapidly escalating fuel costs which cut heavily into the income of owner-operators and led to the disruption of the trucking industry by owner-operators, the ICC implemented expedited procedures, known as Ex Parte 311, for the recovery by owner-operators of their increased fuel costs. On June 1, 1979, the Commission adopted Special Permission No. 79–2620, which authorized regulated carriers employing owner-operators to file for fuel-based increases in freight charges, by means of a percentage surcharge, on ten days' notice. A carrier was required to pass the surcharge on to those parties actually responsible for the payment of fuel costs, *i.e.*, the owner-operators. No specific method of calculating the percentage surcharge was adopted. 44 Fed.Reg. 33232 (1979).[2]

Two weeks later, on June 15, 1979, the ICC issued Special Permission No. 79–2800, the order which is involved in the present case. This order modified the June 1 surcharge order by requiring only one day's notice for fuel-based rate increases, by providing a specific method to be used by the ICC for calculating the allowable surcharge on a weekly basis, and by adding a mandatory component to the surcharge mechanism requiring that all regulated carriers employing owner-operators compensate their respective owner-operators for increased fuel costs at the prescribed surcharge rate from June 15, 1979, forward, whether or not the carriers actually filed for and received such surcharges from their shippers. Unpublished ICC slip order served June 15, 1979 (see Appendix).

These modifications were adopted because the prior procedures did not provide relief to owner-operators to the extent desired. One of the major problems was that carriers often elected not to charge their shippers the extra amount allowed and did not file for Ex Parte 311 surcharges. The ICC believed that the "alarming" rate of fuel price increases created a "situation, especially with regard to owner-operators,

---

1. For a discussion of the roles played by the various parties making up the trucking industry, see *Central Forwarding, Inc. v. ICC,* 698 F.2d 1266, 1267–68 (5th Cir.1983).

2. For a discussion of the ICC response prior to June 1979 to rising fuel costs, see *ICC v. Hemmingway Transport, Inc.,* 1980–82 Fed.Carr.Cas. (CCH) ¶ 82,987 (D.Mass.1982).

of extreme urgency requiring immediate further Commission action to alleviate the impending emergency involving an important segment of the transportation industry and to avoid the possibility of the curtailment of services." *Id.*

The ICC adopted a percent-of-revenue method for determining the allowable fuel surcharge. Each week the ICC developed a national average percentage increase in fuel prices based on prices as of January 1, 1979 (fuel index), and a national average percentage of fuel expenses over total revenue from transportation performed by owner-operators. By multiplying these two percentages the ICC derived that week's surcharge percent. *Id.*

On June 19, 1979, Special Permission No. 79–2800 was amended to extend coverage to carriers not using owner-operators. The owner-operator surcharge figure applied to such carriers for traffic moving at truckload (10,000 lbs. or more) rates, while a second and lower percent surcharge applied to such carriers for traffic moving at less-than-truckload rates. 44 Fed.Reg. 37427 (1979). Thereafter, the ICC continued to publish, on a weekly basis, the two surcharge figures.

On June 22, 1979, the KCC issued Docket No. 15,600 which, with some reporting and recordkeeping modifications, adopted the ICC fuel surcharge plan for use by KCC regulated carriers.

*The present lawsuit*

On April 16, 1980, appellees filed their two-count complaint in federal district court alleging that they transported, under lease with appellant, commodities between June 1, 1979, and February 1980, and that appellant failed and refused to comply with the applicable ICC and KCC fuel surcharge regulations. In Count I each appellee sought damages in the amount of the unpaid fuel costs. In Count II Kenfre Trucking Co. sought damages for its net loss in the forced liquidation of its business caused by appellant's failure to pay the allegedly due fuel costs.

Appellant's answer denied that the majority of the traffic involved, if any, fell under the jurisdiction and regulation of the ICC or KCC. Appellant moved for summary judgment against both appellees for those shipments of commodities exempt from ICC or KCC regulation and for those shipments in territories exempt from such regulation, because the surcharges did not apply to exempt traffic. Attached to the motion for summary judgment was a list of the loads on which appellees alleged appellant failed to pay for fuel cost increases. The list indicated the place of origin, the destination, the commodity of each load, and the amount allegedly owed based on the prescribed surcharge percentage.

Following trial the district court found that appellees made the hauls in question and that the payments they requested for fuel cost increases were accurately calculated based on the weekly ICC percentages. The district court found that, with the exception of one payment in the amount of $65.57 claimed by Wofford, the fuel costs claimed were not paid by appellant. The district court also found that the business losses sustained by Kenfre Trucking Co. were in the amount claimed.

The district court then concluded as a matter of law that the orders of the ICC and KCC applied to appellant as a regulated carrier whether individual shipments were regulated or exempt. This conclusion was based on the language of the orders directing "all regulated carriers" to compensate their owner-operators for increased fuel costs at the prescribed surcharge percentage, without making a distinction between regulated and exempt *shipments.* Finally, the district court concluded as a matter of law that appellant's failure to pay the fuel costs was the direct and proximate cause of Kenfre Trucking Co.'s business losses. Accordingly, the district court entered judgment for Wofford in the amount of $947.48 and for Kenfre Trucking Co. in the amount of $10,587.20 on Count I and $29,251.00 on Count II.

*Subsequent history of the regulations*

Before discussing the points raised on appeal, we will briefly recount the subse-

quent history and eventual demise of the ICC Ex Parte 311 surcharge regulations.

The revenue-based dual surcharge structure that had been in effect since June 19, 1979, led to distortions in fuel cost compensation because no real relationship existed between revenue of a given shipment and its fuel costs, and because carriers using owner-operators for less-than-truckload traffic had to compensate the owner-operators at the truckload surcharge rate. *See ICC v. Hemmingway Transport, Inc.,* 1980–82 Fed.Carr.Cas. (CCH) ¶ 82,987 (D.Mass.1982).

Recognizing these inequities and following rulemaking proceedings, the ICC, by order dated October 5, 1981, phased out the existing surcharge program and replaced it with a plan, to become effective February 12, 1982, requiring carriers to reimburse their owner-operators for fuel costs above January 1, 1979, prices on a cents-per-mile formula. The new regulation froze the percentage of revenue surcharge for sixty days following the effective date of the decision during which carriers could fold into their rates that amount of the surcharge which would cover their increased costs under the mileage reimbursement plan. Modifications of Motor Carrier Fuel Surcharge Program, Ex Parte 311 (Sub. No. 4), 46 Fed.Reg. 50070, 54746 (1981); 47 Fed.Reg. 4689 (1982); 49 C.F.R. Ch. X.

On May 24, 1983, the Fifth Circuit Court of Appeals held in *Central Forwarding, Inc. v. ICC,* 698 F.2d 1266 (5th Cir.1983), that the ICC exceeded its statutory authority in promulgating the new reimbursement regulation because it directly regulated compensation paid by carriers to owner-operators, a power not delegated to the ICC by Congress. The effective date of the mandate vacating orders promulgating Ex Parte No. 311 (Sub-No. 4) was July 23, 1983. The decision was to have no retroactive effect and left intact the existing shipping rates which included the surcharge fold-ins. *Id.* at 1285.

The ICC declined to appeal this decision and terminated its mandatory mileage payment program effective July 23, 1983. Un-

til that date, carriers were required to reimburse their owner-operators pursuant to the cents-per-mile figure. Thereafter, the issue of fuel costs was to be, and is now, a matter of negotiation between owner-operators and carriers. 48 Fed.Reg. 31651 (1983).

*Points on appeal*

On appeal, appellant does not allege error in the district court's findings of fact but alleges several legal errors warranting reversal. Appellant first argues that the district court lacked subject matter jurisdiction under 28 U.S.C. § 1336(a), which provides:

> Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission for the payment of money or the collection of fines, penalties, and forfeitures.

Appellant argues that this case involved more than the mere enforcement of an order for payment of money and that therefore original jurisdiction lies with the circuit court under 28 U.S.C. § 2321(a) & (b), which provides:

> (a) Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.
>
> (b) The procedure in the district courts in actions to enforce, in whole or in part, any order of the Interstate Commerce Commission other than for payment of money or the collection of fines, penalties, and forfeitures, shall be as provided in this chapter.

Appellant relies upon cases which establish that a party seeking review of an adverse order by the ICC in a case involving questions of broad social interest should

bring the action to the circuit court of appeals. *See, e.g., Island Creek Coal Sales Co. v. ICC,* 561 F.2d 1219 (6th Cir. 1977); *Northwestern Wire & Steel Co. v. ICC,* 1983 Fed.Carr.Cas. (CCH) ¶ 83,081 (N.D.Ill.1983).

We believe that in advancing this argument appellant has mischaracterized the procedural posture of the present action. A party sustaining damages as a consequence of a motor carrier's violation of an ICC regulation may seek relief by complaint to the ICC or by bringing suit in federal court. 49 U.S.C. § 11705(b) & (c) (Supp. V 1981).[3] If a party chooses the former route, the resulting ICC order is subject to judicial review in federal court, with the jurisdictional statutes cited above governing whether original jurisdiction lies in the district court or the circuit court.[4]

■ The present action, however, is not one for review of an adverse ICC order but rather an initial complaint for damages in federal court. Original jurisdiction for such an action is in district court, with direct review by the circuit court available. *See, e.g., Emeryville Trucking, Inc. v. Hennis Freight Lines,* 574 F.2d 152 (3d Cir.1978) and *Carothers v. Western Transport Co.,* 554 F.2d 799, 804–05 (7th Cir. 1977) (actions by owner-operators against motor carriers for their failure to pass on fuel surcharges under ICC special permissions pre-dating Special Permission No. 79–2800). In *Carothers v. Western Transport Co.,* the Seventh Circuit based district court jurisdiction upon 28 U.S.C. § 1336(a). *Id.* at 805. We believe the better position is that jurisdiction lies under 28 U.S.C. § 1337, which provides in part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating com-

merce." This section is the basis for jurisdiction over an action to recover freight charges allegedly due a carrier for interstate shipments under tariffs regulated by the ICC, *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (per curiam), which we believe is analogous to the present action.[5]

Appellant next argues that the ICC regulation was invalid because it directly regulated compensation paid by motor carriers to owner-operators, a power beyond the statutory authority of the ICC. Appellant relies on *Central Forwarding, Inc. v. ICC,* 698 F.2d at 1266, which, as stated above, held that the ICC exceeded its statutory authority in promulgating the mileage-based fuel reimbursement regulation.

The decision by the Fifth Circuit Court of Appeals was based in large part on the fact that the mileage-based regulation, unlike its predecessors, was *not* an emergency measure designed to respond to a national or industry-wide crisis. *Id.* at 1269, 1271. It was adopted after lengthy rulemaking proceedings at a time when, according to the ICC, petroleum supplies were ample, fuel prices relatively stable, and the trucking industry was not threatened by labor unrest. *Id.* The court specifically expressed no opinion as to the validity of any other fuel surcharge regulation, recognizing that agencies have powers in times of emergency that they would otherwise lack. *Id.* at 1285 & n. 20. Furthermore, *Central Forwarding* was given no retroactive effect.

■ Without specifically deciding whether the previously abandoned revenue-based regulation at issue in our case was valid, or whether we agree with the Fifth Circuit's conclusions regarding the mileage-based

---

**3.** Former 49 U.S.C. §§ 304(a)(6), 305(g) & (h) provided for the same procedures.

**4.** *See ICC v. Atlantic Coast Line R.R.,* 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966), and *Consolidated Rail Corp. v. ICC,* 685 F.2d 687, 692–97 (D.C.Cir.1982), for a review of this statutory division of review authority.

**5.** Because the present action does not involve questions that raise "issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by the Act," the primary jurisdiction doctrine is not called into play. *See ICC v. Atlantic Coast Line R.R.,* 383 U.S. at 579, 86 S.Ct. at 1003.

regulation, we hold that liabilities which arose under the former regulations may be the basis of a suit for damages.

We come now to the final, and what will be the dispositive, issue in this case. Appellant argues that, as a matter of law, ICC Ex Parte 311, Special Permission No. 79–2800 and the KCC June 22, 1979 Fuel Surcharge Order do not apply to commodities or territories statutorily exempt from rate regulation.

We are deeply troubled with whether appellant presented this issue to the district court for its decision. The question of whether the shipments were exempt was not raised in its answer and, when the parties filed Standard Pretrial Order No. 2. required by the district court, which sets forth stipulated facts and factual and legal issues for determination, we are unable to see that the issue was squarely placed before the district court for its determination. The legal issue posed in the pretrial order is most general:

> Whether the Interstate Commerce Commission or the Kansas Corporation Commission had the authority to require regulated motor carriers to file and publish tariffs and thereby require the payment by those motor carriers of fuel surcharges to long-term owner-operators leased to them.

Suggested findings of fact and conclusions of law were submitted to the district court, which included findings or conclusions (the requests do not separate the two) that the freight was exempt and that the surcharge did not apply to the exempt loads. The issue was also raised in a motion for summary judgment filed on the day of commencement of trial, and, while it was untimely, it was before the court during its deliberations. We thus conclude that the issue was at least indirectly before the district court for its decision and that

we may not refuse to consider it on appeal.[6]

Title 49 U.S.C. § 10526(a) provides that the ICC does not have jurisdiction over transportation by motor vehicle of certain specific commodities. Subsection (b)(1) provides that except to the extent the ICC finds it necessary to exercise jurisdiction to carry out the transportation policy of the Act, it does not have jurisdiction over transportation provided in contiguous municipalities or in a zone commercially a part of the municipalities. The ICC has not exercised jurisdiction over transportation in "commercial zones" in regard to rates and tariffs. Similarly, Kan.Stat.Ann. § 66–1,-109 (1980) provides exemptions from motor carrier statutes for certain commodities.

■ We hold that the regulatory agencies could not have applied fuel surcharges on statutorily defined exempt traffic and could not therefore have imposed corollary obligations upon carriers to make surcharge-based payments to their owner-operators. The language of the regulations themselves clearly indicates that the regulatory agencies understood this limitation. The relevant orders authorize "all regulated carriers ... to depart from the terms of the governing tariff circulars to file and post ... an increase in freight charges ... by means of a percentage surcharge." 44 Fed.Reg. 33232 (1979).

Furthermore, in explaining the Ex Parte 311 order served June 15, 1979, the ICC stated:

> [W]hile we cannot take any action to resolve problems faced by owner-operators in the exempt segment of transportation, we hope our action today ... will assist this segment as well. The Commission does not have jurisdiction to act on those problems but will continue efforts to alleviate the energy crisis insofar

---

**6.** The district court in its order made plain that appellant had made a very sparse record and that the court had found it necessary to intervene to secure the necessary agreement on the pretrial order. Had the issue been more squarely presented to the district court, its consideration of the issues would have been facilitated and proper attention could have been given to this issue at the trial level. Counsel have a duty to aid the courts in determining the issues to be ruled and the record in this case demonstrates more obscuring of the issues than identifying them. Nevertheless, the interests of justice require that we consider the issue on the merits.

as possible under our existing jurisdiction.

Appendix at A-2.

Because the district court concluded that the surcharge regulations applied to exempt as well as regulated transportation, it made no findings of fact as to which traffic involved in this case was exempt from economic regulation by the relevant agency. We therefore find it necessary to remand this case to the district court to render such findings. The district court is directed to amend its judgment in Count I based on such findings. The district court is further directed to reconsider whether a failure to pay Kenfre Trucking Co. the amount determined to be due in Count I, caused the liquidation of the partnership and resulting business losses claimed in Count II, and to enter judgment accordingly.

The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

## APPENDIX

EC

## INTERSTATE COMMERCE COMMISSION

## DECISION

## EX PARTE NO. 311

## EXPEDITED PROCEDURES FOR RECOVERY OF FUEL COSTS

Decided June 14, 1979

In a decision served April 20, 1979, in the above-entitled proceeding, the Commission implemented Special Permission No. 76-350 to provide a mechanism whereby regulated carriers could reflect rapidly increasing fuel costs in the rate structure in an expedited manner.

In a further decision served June 1, 1979, the Commission implemented Special Permission No. 79-2620 which authorized, as of the date of that decision, all regulated carriers to file for future X-311 increases in surcharge form; special justification to

deviate from such method was required. In addition, the Special Permission provides that the person actually responsible for the payment of increased fuel charges, by contract or otherwise, is to receive the full increase in revenue derived from the surcharges. As stated in the prior decision, the reasons for these changes were to ease the deteriorating fuel situation with regard to owner-operators, to facilitate tariff publication, and to provide a clear and easily verifiable method for all parties to determine how much of any given shipment charge is attributable to added fuel expense.

The present situation, especially with regard to owner-operators, is one of extreme urgency requiring immediate further Commission action to alleviate the impending emergency involving an important segment of the transportation industry and to avoid the possibility of curtailment of service.

The Commission believed that authorization of the surcharge and mandatory pass-through provision in the prior decision would provide widespread relief to owner-operators. Relief has occurred in some situations, but not to the extent desired. In some instances, motor common carriers which employ owner-operators have not filed for X-311 surcharges. In other situations, the owner-operators appear not to be receiving adequate compensation or not receiving it fast enough to keep up with the rapidly rising diesel fuel prices.

One of the problems associated with X-311 increases is that the present procedures tend to produce an "after-the-fact" effect. For example, an increase to reflect increased costs from the base period of January, 1979 to a current period of May, 1979, requires an additional period to gather cost data. After filing on 10 working days' notice, the proposed surcharge may not take effect until late June. By the time the surcharge is in effect, it lags behind (according to the carriers anywhere from 30 to 45 days), the increasing burden of rising fuel costs.

APPENDIX—Continued

In Special Permission No. 79–2620, the Commission stated that it would analyze the impact of fuel expenses to determine whether further modifications in the X–311 procedures are necessary. Our analysis shows that fuel prices are increasing at an alarming rate, and that further modifications of the X–311 procedures are required to reduce the time lag and to simplify their application.

As of the date of this decision, those regulated carriers employing owner-operators are authorized to file for fuel-based surcharges to the extent that their operations are performed by owner operators, based on price data derived from a Commission fuel index to be published weekly. This index is an average of diesel fuel prices at selected truck stops in various areas in the United States. In the first index, published today in the attached Appendix, the Commission, by use of the price index (permitting a 5 percent deviation) and by deriving a national average of the percentage of fuel expense of total operating revenues for purchased transportation, has indicated the maximum allowable surcharge to be taken for the period from January, 1979, to the present, absent a special showing that a differing amount is justified.[1] (The surcharge shall be appropriately reduced, depending upon the percentage to total revenues from transportation performed by owner-operators). In each succeeding week, the Commission will indicate in its published index the maximum adjustment permissible under these special procedures. These surcharges can be proposed on one day's notice without a special justification statement by the carriers and will not be suspended so long as they are within the range set forth in our index. Carriers may continue to use other Ex Parte No. 311 procedures for fuel increases not covered here. However, we will consider possible future adjustments to the formula so that it can also be used for increased fuel costs incurred when owner-operators costs are not utilized.

We emphasize that the new procedures are for increased fuel costs only and may *not* be used to offset other increased costs. Carriers may continue to use Special Permission No. 79–2620 or Special Permission No. 76–350, where appropriate.

We warn all carriers that abuse of these procedures will not be tolerated. We will continue to closely monitor the fuel situation. If it is determined that carriers are taking surcharges greater than needed to offset increasing owner-operators' fuel costs, they will not be permitted to use this new Special Permission again.

In the prior decision, the Commission ordered that any surcharge must include a provision that would pass-through to the person bearing the increased fuel expense the full increase derived from the surcharge. It appears that one of the major problems is that many carriers are not filing surcharges and the owner-operators are therefore not being adequately protected. Because of the extreme nature of the emergency, the Commission finds that it must order that all regulated carriers, whether or not they have taken an X–311 increase, must from this date forward compensate owner-operators fully for all additional fuel expenses incurred by these operators. We intend to monitor and enforce this decision.

All regulated carriers which have already compensated their owner-operators, but did not use Special Permission No. 79–2620 to recoup these expenses may use Special Permission Nos. 79–2620 or 76–350, where appropriate.

The Commission is aware that there are several other severe problems facing owner-operators and other regulated motor carriers as well, namely problems of fuel allocation and the situation regarding differing weight, height, and length standards in the different states. Similarly, while we cannot take any action to resolve problems faced by owner-operators in the exempt segment of transportation, we hope our action today and information of the type set forth in the appendix will assist this

---

**1.** In such case, Special Permission No. 79–2620 must be utilized.

APPENDIX—Continued

segment as well. The Commission does not have jurisdiction to act on those problems but will continue efforts to alleviate the energy crisis insofar as possible under our existing jurisdiction. In this regard, although we are authorizing surcharges in this crisis situation, we implore the carriers and owner-operators to take all possible fuel conservation steps. Towards this goal, we support any efforts to acquire and adopt fuel conserving practices and devices.

*It is ordered:*

All regulated carriers, whether or not they have filed for Ex Parte No. 311 fuel-based increases under our decisions of April 20 and June 1, 1979, are to compensate their respective owner-operators for increased fuel costs from this date forward. The base date for measuring expense increases is January 1, 1979. At a minimum, the owner-operators shall receive compensation at the level set forth in the Appendix.

SPECIAL PERMISSION NO. 79–2800

EMERGENCY FUEL SURCHARGE— SPECIAL PROCEDURES BASED ON COMMISSION FUEL INDEX

In a decision served June 1, 1979, the Commission implemented Special Permission No. 79–2620 which authorized carriers to file for fuel-based increases under Ex Parte No. 311 in surcharge form on 10 working days' notice. Because of the severe nature of the fuel emergency, and because the prior authority does not entirely meet the immediate need of certain carriers and/or persons bearing the increased fuel charges, further relief is warranted.

*It is ordered:*

1. All regulated carriers which employ owner-operators, or the authorized publishing agents of such carriers that have tariffs or schedules on file with this Commission, or those qualifying carriers or agents that may in the future file tariffs or schedules with this Commission, are authorized to depart from the terms of the governing tariff circulars to file and post on one day's notice to this Commission and the public, an increase in freight charges for line-haul transportation and charges for other services which consume fuel such as pickup and delivery, which must be specified in the tariff, by means of a percentage surcharge. Carriers may continue to use Special Permission Nos. 79–2620 or 76–350, where appropriate.

2. The maximum percentage surcharge allowed under this Special Permission will be determined by publication by the Commission of a national fuel index, on a weekly basis. This index is an average of diesel fuel prices at selected truck stops in various areas in the United States. In the first index, published as an Appendix to this decision, the Commission, by use of this index (permitting a 5 percent deviation) and by deriving a national average of the percentage of fuel expense of total operating revenues for purchased transportation, has indicated the maximum allowable surcharge to be taken for the period from January, 1979 to today. In each succeeding week, the Commission will indicate in its published index the maximum additional adjustment to this surcharge. Carriers may utilize these procedures by submitting a tariff schedule indicating a surcharge not to exceed the allowable percentage. No further justification statement is required. If such schedule is in conformity with this decision, the Commission will not exercise its suspension power. Carriers shall certify that the percentage of the surcharge has been appropriately reduced, depending on the percentage of total revenue from transportation performed by owner-operators.

3. The person actually responsible for the payment of fuel charges, by contract or otherwise, is to receive the full increase derived from the surcharges published hereunder, except in the situation where the carrier has already compensated its owner-operators for increased fuel expenses since January 1, 1979, and has not requested an Ex Parte No. 311 increase. In that case, the carrier may use this Special Permission or Nos. 79–2620 and 76–

APPENDIX—Continued

350, where appropriate, to recoup such payments.

4. Each publication containing the surcharge shall contain whichever of the following certifications is appropriate:

This is to certify that each carrier party to this publication has been notified that: Special Permission No. 79–2800 requires that the person actually responsible, by contract or otherwise, for the payment of fuel charges is to receive the full increase in revenue derived from surcharges published hereunder, and that a carrier's participation in a publication filed hereunder constitutes an undertaking to comply with that requirement.

or

This is to certify that the person actually responsible, by contract or otherwise, for the payment of fuel charges will receive the full increase in freight revenue to be derived from the proposed surcharge.

5. All surcharges filed under this Special Permission must have an expiration date of no later than October 31, 1979. Special Permission No. 79–2800 will remain in effect until October 31, 1979, unless extended by further decision of the Commission.

6. Publications issued and filed hereunder shall be exempt from the supplemental and volume limitations of the tariff circulars, shall contain no other matter, and shall bear the following notation:

Issued on one day's notice: I.C.C. permission No. 79–2800.

7. The surcharge filed and posted under the authority of this permission may take the form of master tariff of increase, or as a supplement to the affected tariffs. If the master tariff form of publication is to be employed, reference will be made by connecting link supplement to each tariff (to be made subject to the master tariff) connecting such tariff with the master. Such supplements may be blanket supplements (a common supplement issued to two or more tariffs), provided each copy officially filed is hand marked in the tariff it supplements.

8. Only one surcharge as to a tariff may be in effect at one time. Increases of less than .5 percent shall not be requested under this Special Permission.

9. The surcharge provisions must include a rule for disposition of fractions of one cent or other stated amounts, or refer to a conversion table of increased charges or fares.

10. All outstanding orders of the Commission are modified to the extent necessary to permit the filing of the tariffs authorized herein. Increases filed under this Special Permission shall not be deemed general increases or general adjustments as defined in section 1102.1 and 1104.1(a) of Chapter X of Title 49 of the Code of Federal Regulations.

11. The requirement of following rate bureau procedures provided in agreements approved by this Commission under section 10706 of the Act (formerly sections 5a and 5b) is waived to the extent necessary to permit the filing of the tariffs authorized herein.

12. Notice of this Special Permission shall be given to the general public by mailing a copy of this decision to the Governor of each State and to the Public Utilities Commissions or Boards of each State having jurisdiction over transportation, by depositing a copy in the Office of the Secretary, Interstate Commerce Commission, Washington, D.C., for public inspection, and by delivering a copy to the Director, Office of the Federal Register, for publication therein.

13. This decision shall become effective on date served.

By the Commission, Chairman O'Neal, Vice Chairman Brown, Commissioners Stafford, Gresham, Clapp, and Christian.

H.G. HOMME, JR.
Secretary

(SEAL)

--------------------

COMMISSIONER CHRISTIAN, concurring in part and dissenting in part:

APPENDIX—Continued

Although I encourage and expect carriers to take full advantage of the opportunity offered by this decision, I do not think it appropriate for the Commission to require carriers to compensate owner-operators for increased fuel costs in the absence of X–311 filings. Aside from this reservation, I fully agree with today's decision.